**GATEWAY EQUIPMENT CORP., Plaintiff,**

**v.**

**UNITED STATES of America, Defendant.**

No. 00–CV–51C(SC).

United States District Court, W.D. New York.

Feb. 23, 2003.

Harold D. Rogers, Esq., Wichita Falls, TX, for Plaintiff.

United States Department of Justice, Tax Division (Bartholomew Cirenza, Esq., of Counsel), Washington, DC, for Defendant.

## INTRODUCTION

CURTIN, District Judge.

Plaintiff Gateway Equipment Corporation ("Gateway") brought two actions[1]

---

1. The actions were consolidated on September 18, 2001. Item 38.

against the United States for the recovery of excise taxes. In the first action, docketed as 00–CV–51, Gateway alleged that taxes in the amount of $15,534.00 were erroneously and illegally assessed against and collected from it during the taxable quarter ending June 30, 1995. Item 1. Shortly after the first action was filed, Gateway filed another action against the United States to recover additional excise taxes in the amount of $105,823.00 assessed and collected during seven taxable quarters ranging from June 30, 1992 to December 31, 1994. That case, originally docketed as 00–CV–124, was consolidated with the present action. Item 38. The excise taxes were assessed on sales of Flow Boy Live Bottom semitrailers, model CB–4000 ("CB–4000 units"), used in highway construction and manufactured by Flow Boy Manufacturing ("Flow Boy Mfg."), a division of Dan Hill & Associates, Inc., Norman, Oklahoma. During the time period of this case, Gateway was a distributor of Flow Boy equipment. It purchased the CB–4000 units from Flow Boy Mfg. for resale to customers ("end-users") in the highway construction business, and added the 12 percent excise tax to the cost of the machine. It then paid the excise tax to the Internal Revenue Service.

The government answered, Item 2, and on April 5, 2000, Gateway moved for summary judgment. Items 4–6. Gateway based its summary judgment argument on three grounds: (1) collateral estoppel premised on a previous decision in *Flow Boy, Inc. v. United States*, 1984 WL 15513 (10th Cir. Jan. 20, 1984); (2) the United States has treated Gateway differently than "similarly situated" taxpayers; and (3) the CB–4000, by its design, is excepted

from the Federal Excise Tax ("FET") in Treasury Regulation 26 C.F.R. § 48.4061(a)–1 (2001).

The court ordered discovery to proceed on the first two grounds, collateral estoppel and fairness. Item 7. The United States then filed papers in opposition to the motion for summary judgment on February 20, 2001. Items 17, 18. Plaintiff filed a reply, Item 24, and oral argument on the first two grounds took place on May 31, 2001.

Following oral argument, and prior to reaching a decision on the summary judgment motion, the court issued an order stating that discovery on the third issue should be conducted. Item 29. Deposition transcripts were filed with the court,[2] and the government filed the report of its expert, G. Allan Hagelthorn. Item 69. The government then filed a supplemental memorandum, Item 76, and the plaintiff filed a reply memorandum. Item 78. Oral argument was heard on July 31, 2002.

At this time, all three issues submitted by the plaintiff are before the court. For the reasons set forth below, the court grants summary judgment to Gateway on the design and fairness issues and denies summary judgment to Gateway on the grounds of collateral estoppel.

## FACTS

### A. Description of the Units

In 1969, Flow Boy (or its predecessor companies[3]) began to manufacture the ST–1000 unit, the precursor to the CB–4000 unit. Item 6, ¶ 6. The Flow Boy ST–1000 units were "specially designed to efficiently and safely discharge hot-mix as-

---

**2.** Items 20–22, 52–57, 61–67, and 72–74.

**3.** In 1982, Dan Hill & Associates, Inc. acquired the Flow Boy manufacturing operation from Flow Boy, Inc. Item 4, Ex. I, ¶ 6. Dan

Hill & Associates continues to manufacture the CB–4000 today through its Flow Boy Manufacturing division.

phalt into the laydown machine for the purpose of building roads and highways." Item 6, ¶ 8; Item 18, ¶ 8. The unit is placed in front of a laydown machine (a paver), with both the Flow Boy unit and the laydown machine moving down the roadbed/highway simultaneously.[4] The Flow Boy unit continuously delivers asphalt into the laydown machine, resulting in building a new highway or resurfacing an existing highway. Item 6, ¶ 11; Item 18, ¶ 11. This process is performed on a prepared bed (1) before a new highway is finished or (2) within barricades so that during the construction process, no public traffic is allowed on that part of the prepared bed and/or highway under construction. *Id.* (A photograph showing the Flow Boy semitrailer working with a laydown machine is attached to Item 4 as Ex. S. The Flow Boy unit is attached to and pulled by a tractor-truck.)

The CB–4000 unit is an updated and improved version of the ST–1000, "primarily designed for the same purpose as the ST–1000."[5] Item 4, Ex. Q, ¶ 9. The CB–4000 is described as a "patented hydraulically controlled, horizontal materials discharge system." Item 6, ¶ 10; Item 18, ¶ 10. It is "identical to the ST–1000 units in all major respects regarding design except for the fact that the slatted roller chain in the CB–4000 units is covered with a continuous rubber belt whereas the ST–1000 was manufactured with an open slatted roller chain." Item 6, ¶ 9,[6] Item 18, ¶¶ 9, 48. The chain is driven by a hydraulic motor. Item 22, p. 60. The "horizontal materials discharge system" consists of the mechanism delivering and controlling the discharge of the hot-mix asphalt. A rubber belt, located on the floor of the hopper, is attached to a steel-slatted roller chain which carries the payload to the rear tailgate, where it is discharged at a precisely controllable rate. Item 6, ¶ 10. The CB–4000 hopper is equipped with insulated sidewalls "primarily designed for handling hot-mix asphalt and asphalt related materials as well as low-slump concrete for highway construction." *Id.* The insulation keeps the payload of hot-mix asphalt or asphalt-related materials at a proper temperature for highway construction. Item 6, ¶ 10; Item 18, ¶ 10. The maximum payload is 33 to 35 tons. Item 4, Ex. R; Item 6, ¶ 58. The CB–4000 is equipped to comply with federal and state regulations for highway use, including brake lights, mud flaps, and highway tires. Item 4, Ex. R.

In 1995, the cost of the CB–4000 was $43,150.00, excluding federal excise tax. Item 4, Ex. Q, ¶ 16. That cost ranged "from one-third to 50% more than the cost of over-the-road hauling semi-trailers and end dump trailers." *Id.*

Gateway officers and its attorney, Harold Rogers, became aware that Flow Boy Mfg. had applied for and received excise tax refunds for the CB–4000 units during the same taxable quarters at issue, and had passed on the refunds to end-user customers located in 17 states,[7] including

---

4. Depending on the paver, the Flow Boy and the paver can be attached by a truck hitch. Item 22, pp. 77–78.

5. Contractors who own both the ST–1000 and the CB–4000 machines use them interchangeably. Item 66, pp. 54–55.

6. The government admitted this point in its Statement of Disputed Facts in replying to Gateway's Statement of Undisputed Facts,

Item 18, ¶ 9, but later denied it. *Id.* ¶ 24. The government also admitted this fact in a later filing, Item 77, ¶ 48. The court thus considers this statement an admission.

7. Although in its complaint Gateway asserts that refunds were passed on to end-users in 17 states, in affidavits submitted in support of summary judgment, Gateway claims that end-

New York State. *Id.* ¶¶ 28, 29. Gateway also became aware that distributors in other states had been successful in applying for excise tax refunds on the CB–4000 units. *Id.* ¶¶ 31–36. When Gateway applied for a FET refund on the CB–4000 units it had sold during the quarters at issue, the IRS denied the claim. *Id.* ¶ 4; Ex. A. Consequently, Gateway filed both actions.

## B. The Oklahoma Litigation

In 1982 Flow Boy, Inc. sued the federal government, asserting that the ST–1000 trailer was not subject to the FET, and demanded a refund of excise tax paid. Item 4, Ex. B. The Flow Boy units at issue in *Flow Boy, Inc. v. United States*, 1982 WL 1735 (W.D.Okla. April 20, 1982) were identical to the units which had previously been held not subject to the FET in *J.H. Holland Co. v. United States*, 1977 WL 1282 (W.D.Okla. April 21, 1977).[8] In the *Flow Boy* litigation, the plaintiff contended that the unit was not subject to the excise tax because it was specially designed for the primary function of transporting hot-mixed asphalt in a construction operation other than over the public highway.[9] Flow Boy, Inc. also asserted that the use of the unit in transporting a load over the public highway was substantially limited or substantially impaired because (a) the Flow Boy was specially designed to carry weight in excess of the legal road limit; (b) the unit's special design resulted in its being sold at prices approximately two and one-half times the price of a conventional semi-

end dump trailer having the same highway payload capacity; and (c) the Flow Boy could not economically haul over the public highway. Flow Boy, Inc. maintained that the excise tax had not been included in the price of the units, and therefore, the tax had not been passed on to the purchaser.

The government, on the other hand, claimed that the unit was not specially designed for the primary function of transporting a particular type of load other than over the public highway. Alternatively, the government argued that even if it was specially designed, that special design did not substantially limit or substantially impair the use of the vehicles to transport such load over the public highway. It also asserted that Flow Boy passed on the tax to its customers and therefore was not entitled to a refund.

A jury found for Flow Boy, and against the government, on three issues: (1) the Flow Boy trailer was specially designed for the primary function of transporting a particular type of load other than over a highway in connection with construction; (2) the Flow Boy's special design substantially impaired the use of the vehicle to transport its load over the public highway; and (3) Flow Boy did not include the excise tax in the sales price of the unit. The court denied the government's Motion Notwithstanding the Verdict, and Flow Boy received a refund of the excise taxes it had paid, plus interest. *Flow Boy, Inc. v. United States, supra.*

---

users in 21 (Item 4, Ex. H, ¶ 9) or 22 (Item 4, Ex. E, ¶ 8) states benefitted.

**8.** Following the favorable decision in *J.H. Holland Co. v. United States*, where the judge held that the ST–1000 units were primarily designed to transport construction materials other than over the highway, the IRS amended the excise tax regulations applicable to the ST–1000 units, forcing Flow Boy Inc. to re-

litigate the question. Item 4, Ex. I, ¶¶ 2, 3. Flow Boy, Inc. had purchased the Flow Boy trailer manufacturing operation from a successor company to the J.H. Holland Co. in October 1977.

**9.** The regulation at issue, 48.4061(a)–1(d)(2)(ii), which governs whether excise tax is charged, is set forth in Section II, *infra.*

The government appealed only the second finding. The Tenth Circuit held that the Flow Boy design was such that its over-the-highway use was substantially impaired, and affirmed the refund of the excise taxes. *Flow Boy, Inc. v. United States*, 1984 WL 15513 (10th Cir. Jan. 20, 1984).

## C. Refunds

In his affidavit, Richard Sheridan, General Manager of Gateway, outlined how Gateway started selling the CB–4000 units in 1990, and originally added the FET to the selling price. Item 4, Ex. E, ¶ 4. Gateway was then advised by Dan Hill & Associates, the Flow Boy manufacturer, that "the CB–4000 units were not subject to the federal excise tax since such units were identical in all major respects to the Flow Boy Live Bottom SemiTrailer model ST–1000 (ST–1000) which units had been held to be nontaxable by the Tenth Circuit Court of Appeals in *Flow Boy, Inc. v. United States*." *Id.*

On August 1, 1995, Gateway filed FET refund claims for various taxable quarters, based on the *Flow Boy* holding. *See Flow Boy, Inc. v. United States*, 1984 WL 15513 (10th Cir. Jan. 20, 1984). On April 18, 1997, the IRS notified Gateway that Gateway's claims for refund would be denied in full. *Id.* ¶ 6. In the fall of 1998, Gateway was informed by Dan Hill & Associates that the IRS had approved and granted excise tax refunds on CB–4000 units to Dan Hill and a number of other Flow Boy distributors, including Critzer Equipment Co. of Spokane, Washington, The McLean Company of Cleveland, Ohio, and Ranchers Supply Co. of Lamar, Colorado. *Id.* ¶ 7. Gateway also learned that these distributors passed the excise tax refunds to end-users in 22 different states, including three end-users in New York.[10] *Id.* ¶¶ 8, 9.

Through the office of New York Senator Charles Schumer, Gateway requested that the IRS reverse its denial of Gateway's request for excise tax refunds. Item 4, Ex. F. Following a November 16, 1999 meeting, the IRS Assistant Chief Counsel denied the request in a letter to Senator Schumer. Item 4, Ex. G. The letter stated that the IRS believed *Flow Boy* had been wrongly decided; that the "administrative settlements" that the Senator referred to in his letter of November 24, 1999, Item 4, Ex. F, did not reflect IRS policy; and that the IRS's effort to gain a circuit split so that the case may be taken to the Supreme Court is an important avenue for the IRS to pursue when it believes a case has been wrongly decided. Item 4, Ex. G.

Gateway continued to add excise taxes to the CB–4000 units it sold.[11] It asserted

10. During the deposition of Richard Sheridan, Gateway General Manager, the government attorney inquired about statements in Mr. Sheridan's affidavit (Item 4, Ex. E), where he stated that Gateway had been informed by Dan Hill & Associates that the IRS had approved excise tax refunds on CB–4000 units to other Flow Boy distributors, who passed the refund on to their customers in 22 states, including New York. Mr. Sheridan admitted that he had no firsthand personal knowledge of those facts, other than being told by Gateway attorney Harold Rogers and people at Dan Hill and at one of the other distributors. Item 21, pp. 7–9. This evidence would therefore be inadmissible except for the fact that it was also included in the affidavit of David Griffis, Vice President of Dan Hill & Associates, Item 4, Ex. H, and Mr. Rogers, Item 4, Ex. I. The court therefore accepts these facts on summary judgment. The government did not admit or deny them in its Statement of Disputed Facts; it simply responded that such facts were "irrelevant." Item 18, ¶¶ 29–32.

11. Sometime during early 2000, the Distribution Agreement was amended by Mr. Sheridan to provide that Gateway would be an agent of Dan Hill & Associates. Item 22, p. 177. Under this arrangement, Gateway does

that having to add the 12 percent FET provides its competitors with an unfair advantage, since other Flow Boy distributors can sell the unit for $5,160.00 less, and its non-Flow Boy competitor, Red River,[12] does not charge excise tax on its model. Item 4, Ex. E, ¶¶ 13, 14; Item 52, p. 54. Mr. Sheridan also asserted that since April 1983, Gateway had not added FET to the ST–1000 units it had sold, despite being audited twice by the IRS. *Id.* ¶ 16.

David Griffis, Executive Vice President of Dan Hill & Associates, submitted an affidavit in support of Gateway's fairness argument. Item 4, Ex. H. He stated that he was present when the excise tax field auditor from the IRS District Office in Oklahoma City, John S. Munholland, inspected the Flow Boy manufacturing operation on April 29, 1996. The auditor determined that the CB–4000 units were not subject to the FET. *Id.* ¶ 7. The report of this audit examination prompted the refunds to Flow Boy Mfg. for 16 taxable quarters, from March 31, 1992 to December 31, 1995. The refunds were passed on to end users in 22 states. *Id.* ¶ 8.

Harold Rogers also submitted an affidavit in support of Gateway's fairness argument, noting that he had prepared claims for FET refunds regarding all CB–4000 units sold by Flow Boy to three other distributors (Critzer, Ranchers, and McLean) for the years 1992 to 1995. Item 4, Ex. I, ¶ 8. All claims were allowed in full by the IRS. *Id.* ¶ 9. He also prepared Flow Boy Mfg.'s refund claims which were allowed for that same period. *Id.* ¶ 11. Mr. Rogers attached as exhibits to his affidavit IRS documents pertaining to Critzer Equipment, McLean Company, and Ranchers Supply Co. indicating the FET

refunds. *Id.* Exs. JM, O. On the Excise Tax Examination Changes and Consent to Assessment and Collection Form for Critzer Equipment Co., the IRS had written, "[t]he tax periods shown above are corrected to reflect the determination that the eight (8) Flow Boy [CB–4000] trailers involved in your claims for refund and identified on attached consent form have been found to be non-taxable equipment used in construction." *Id.* Ex. J. Appended as Exhibit O to Rogers' Affidavit was a Notice of Adjustment relating to the refunds the IRS issued Ziegler, Inc. in accordance with a settlement agreement in the case of *Ziegler, Inc. v. United States,* D–Iowa., 4–97–CV–10242, dismissed with prejudice.

Also included in the exhibits to Rogers' affidavit were two letters (*Id.* Exs. N and P) from the Albany, New York IRS Appeals Office to Contractors Sales Co. of Albany, which Mr. Rogers characterized as the IRS's agreement to settle the IRS cases against Contractors "by conceding 80% of the excise tax [on the ST–1000 and the CB–4000 respectively] to Contractors." *Id.* Ex. I, ¶ 15, 18.

## DISCUSSION

### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Mor-*

---

not have to collect the excise tax on the CB–4000. *Id.* pp. 183–84.

**12.** Red River is the only competitor to the Flow Boy. It manufactures a live-bottom semi-trailer, similar to the Flow Boy unit. Item 22, pp. 13–16; Item 66, pp. 84–85.

ales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir.2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The object of summary judgment "is to discover whether one side has no real support for its version of the facts ...." Community of Roquefort v. William Faehndrich, Inc., 303 F.2d 494, 498 (2d Cir.1962).

## II. Design

■ At issue in this action is whether the design and use of the CB–4000 subject it to the federal excise tax. The Internal Revenue Code provides that a tax of 12 percent on the first retail sale of truck-trailer and semitrailer bodies must be charged. 26 U.S.C. § 4051(D). A highway vehicle is defined in 26 C.F.R. § 48.4061(a)–1(d) as "any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functins [sic], but does not include a vehicle described in paragraph (d)(2) of this section." Paragraph (d)(2), entitled "exceptions," provides:

(ii) *Certain vehicles specially designed for offhighway transportation.* A self-propelled vehicle, or a trailer or semitrailer, is not a highway vehicle if it is (A) *specially designed* for the primary function of transporting a particular type of load other than over the public highway in connection with a construction ... operation..., and (B) if by reason of such special design, the *use* of such vehicle to transport such load over the public highways is *substantially limited or substantially impaired.* For purposes of applying the rule of (B) of this subdivision, account may be taken of whether the vehicle may travel at regular highway speeds, requires a special permit for highway use, is overweight, overheight or overwidth for regular use, and any other such relevant considerations.

26 C.F.R. § 48.4061(a)–1(d)(2)(ii) (emphasis added).

If a vehicle fits the two elements of the test set forth in paragraph (d)(2), it is not subject to the excise tax. The plaintiffs do not dispute that the Flow Boy meets the definition of highway vehicle; they contend that it satisfies the exception in that it is specially designed and substantially limited/impaired.

## A. Is the CB–4000 specially designed?

Gateway argues that there are no genuine issues of material fact relating to the design of the CB–4000: (1) it is "primarily designed to deliver hot-mix asphalt into the paver for resurfacing or construction of highways;" (2) the special design features include the horizontal discharge mechanism, not present in dump trucks or end dump trailers, and the insulated sidewalls; (3) in order to be economical in operation, it is designed to carry a maximum 33–ton payload. This means that the weight of the payload, plus the weight of

the empty trailer and tractor, would exceed the legal highway limit of 80,000 pounds, requiring a special permit; (4) end-users buy the units to deliver hot-mix asphalt into a paver, and use it for that purpose from 75 to 99 percent of the time; (5) travel over the highway to the job site is incidental to the job function. Of the total time involved in a job, 30 to 35 percent is travel time, and 65 to 70 percent is time at the job site. Item 78, pp. 4–6.

The government asserts that material facts concerning the design and use of the CB–4000 are in dispute, warranting denial of Gateway's summary judgment motion. In particular, the government contends that the CB–4000 units "are not specially designed to carry a particular kind of load" because they also have been used to transport road salt, sand, dirt, and smaller aggregate stone "as much as 25% of the time . . . ." Item 76, p. 7.

As stated above, the regulations do not define "specially designed." Implicit in the term "special design," particularly in this case, is a comparison with a vehicle that is *not* specially designed that could haul all kinds of loads over the highway year-round, such as a dump truck or an end-dump trailer. Thus, a design becomes "special" in this case when a unit that has general hauling capability is modified for a particular payload.

### 1. Designed to Deliver Hot-mix Asphalt

The CB–4000 is built with a "horizontal materials discharge system" which maintains a uniform flow of asphalt into the paver. The original 1971 patent for the ST–1000, precursor to the CB–4000, indicated that the "invention relates to a material delivery system in which hot asphalt is transported to paving machines in large capacity semi-trailers." Item 21, Ex. A, line 23–25. David Griffis, Executive Vice President of Dan Hill & Associates and the design supervisor for the Flow Boy CB–4000 units, estimated that the weight of the horizontal materials discharge system is 2,500 pounds, and its cost is $15,000.00. Item 4, Ex. Q, ¶ 10. The machinery, which includes motors, head shafts, foot shafts, and bearings, Item 52, p. 46, and a discharge valve, Item 22, p. 53, allows the operator to regulate the flow of the asphalt into the laydown machine. This is important, since on state highway construction jobs there is a smoothness specification, Item 22, pp. 39–40, which, if not met, requires repaving, Item 66, p. 46, or the contractor may be fined. Item 22, pp. 47–49. This is a clear advantage when compared to a dump truck, which dumps the asphalt into a pile. Item 22, pp. 40, 41; Item 55, p. 41; Item 66, p. 92.

The fact that the payload exits through the back via the belt is also a significant design feature when compared to dump trucks. In order to dump their load, dump trucks must raise their bodies, allowing the load to exit by force of gravity through an open tail gate. Item 22, p. 41. The dump truck operator has no control over the speed and amount of payload dumped. "The problem is the off-loading. You can't control [the payload], so when they raise the end-dump dump trailer, and you hit that certain point, it will throw out two, three ton at a time, and you will have 20 tons, or you would have a bump in the road . . . ." Item 65, pp. 38–39. Many contractors agreed that dump trucks are much more likely to tip over, given their higher center of gravity. The delivery of the dump truck payload is affected by overhead obstructions such as overpasses, bridges, trees, and wires. In comparison, the Flow Boy CB–4000 design does not make it susceptible to tipping over. The design also makes it possible to operate where dump trucks cannot because of

overhead obstructions. Item 4, Ex. Q, ¶ 13; Item 20, p. 31; Item 54, pp. 39–40; Item 55, pp. 35–36, 41; Item 57, pp. 37–38; Item 62, p. 49; Item 63, p. 30; Item 64, p. 56; Item 65, p. 59; Item 66, pp. 91–92, 109; Item 73, p. 33.

### 2. Insulation

The CB–4000 is designed with insulated sidewalls, unlike regular trailers. Item 58, p. 12. New York State specifications require hot-mix asphalt to be a certain temperature at the point of releasing it into the paving machine. Item 66, p. 45. The insulation allows the hot mix to stay hot for as much as three to four hours at the job site, depending on the ambient temperature. Item 58, p. 12. This is an advantage for contractors, since "when you get at a job site, anything can happen. I mean you can have a breakdown, the insulation was designed that if you're sitting at the job site, that trailer will keep the blacktop to a temperature that will be acceptable by the state inspector." Item 74, pp. 39–40. Another contractor stated, "[I]f you get on a job and the machine breaks down or something, the longer you can hold the material, the longer you can keep it. If you did have a trailer that wasn't insulated, they may have to throw the load away too. You may waste a load." Item 20, p. 22.

### 3. 32 to 35–Ton Capacity

The CB–4000 was designed for a maximum payload of 33 to 35 tons, in comparison to a dump truck capacity of 17 to 20 tons. Item 66, p. 83. This special design feature relates to the practicalities of doing business in the highway construction field. "Such designed use of maximum payloads mean fewer cycles per day, fewer trailers needed, less trailer working time and less cost per ton delivered to the lay down machine." Item 4, Ex. Q, ¶ 12. End-users

are well aware of how valuable it is to carry 34 tons, Item 74, p. 33, and in fact, to be profitable, it has to be loaded to its maximum payload. Item 66, p. 98; ¶ 8 in Items 40, 42, and 47–49

### 4. Highway Travel

In addition, the contractors agreed in their depositions that the use of the CB–4000 to travel on the highway from the asphalt plant to the construction site is incidental to the use to which the unit is put. On average, the unit spends 65 to 70 percent of its time working in conjunction with the laydown machine at the site, which is either on a new highway being constructed or behind barricades while resurfacing an old highway (*i.e.*, off the public highway). Item 66, p. 95. It spends 30 to 35 percent of the time traveling to and from the site. Item 52, pp. 46–47; Item 57, pp. 43–44; Item 65, pp. 65–66, 68; Item 74, pp. 34–35. The court concludes that the unit would have no practicality if it was not designed to carry the payload to the construction site.

### 5. Payload

The government argues that the CB–4000 is not specially designed for hot-mix asphalt because it carries a number of other items. The brochure indicates that it is versatile, and can carry aggregate and crushed material, hot-mix asphalt, sand, salt, low-slump concrete, and recycled asphalt. Item 4, Ex. U. *See also* Item 6, ¶ 10. A number of contractors estimated they occasionally carry other materials from 1 to 25 percent of the time. ¶ 7 of Items 40–49; ¶ 11 of Boehmer Aff. (attached to Item 4 following Ex. S). But simply because the CB–4000 may carry loads other than hot-mix asphalt does not mean that the unit is not specially designed. The special design of the horizontal discharge unit limits the size of materi-

al (other than hot-mix asphalt) that can be carried. The contractors agreed that hauling aggregate over the size of two-inch stone presents problems, because the material will get stuck in the chain mechanism or break it. Item 62, pp. 13, 48. Thus, the special design of the discharge mechanism limits what payload may be transported.

As David Griffis, Executive Vice President of Dan Hill & Associates, pointed out, "[i]f the CB–4000 had been specially designed to haul over public highways, it would have been designed (1) without the designed payload of 33 tons; (2) without the extra weight and cost attributable to the horizontal materials discharge system; and (3) without the insulated sidewalls." Item 4, Ex. Q, ¶ 19.

### 6. Expert Report

The court finds the testimony and report of the government's expert, G. Allan Hagelthorn, particularly unhelpful in its effort to determine whether the unit is "specially designed." In his report, Item 69, Mr. Hagelthorn concludes that the CB–4000 "is not specially designed for transporting a particular type of load other than over the public highway because the added equipment in connection for loading and unloading materials at a construction site does not substantially limit or substantially impair the vehicle's use for hauling materials over public roads." *Id.* p. 1 (emphasis omitted). Here, Mr. Hagelthorn conflates the two distinct elements of the test. His conclusion does not address the first element at all. He comments that "the vehicle and its affixed machinery is not exclusively used for highway construction" but does not provide any insights on how that impacts the design of the unit. *Id.* p. 3. He comments that the semitrailer design "is not restricted to serve only as a 'mobile carriage and mount' but is designed to carry materials such as asphalt and gravel in conventional commerce over public roads." *Id.* However, Mr. Hagelthorn provides no support for this conclusion in his report by citing relevant facts or data, leading this court to discount it.

Serving to underscore this point is the fact that Mr. Hagelthorn did not consider a number of highly relevant facts that the court finds have a bearing on whether his analysis and conclusions are reliable and helpful to the court in determining the design issue. The plaintiff has highlighted these omissions in its Reply Brief, Item 78, pp. 16–18. Particularly egregious is the fact that Mr. Hagelthorn did not take into account the CB–4000's horizontal discharge mechanism in arriving at his conclusions. Item 72, pp. 29–30. He did not "go into any discussion about the specific application" of the units, *id.* p. 33, or other design features, *id.* pp. 34, 35, or limitations (*i.e.,* the required permit), *id.* p. 38, even though he asserts he "considered the design and the use to which this vehicle would be used." *Id.* p. 50.

■ For a court to fairly evaluate an expert's report, "[t]he expert must explain how and why he reached his conclusion, and courts do not have to credit opinion evidence connected to data only by the *ipse dixit* of the expert." *Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 437–38 (W.D.N.Y.2001) (citing *General Elec. Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). Mr. Hagelthorn has provided *ipse dixit* conclusions which do not take into account relevant information, and the court finds his conclusions on the special design issue utterly unhelpful.

Mr. Hagelthorn's deposition testimony sheds little light on the conclusions in his report. He posits that the units are not specially designed for carrying a load other than over a public highway for highway construction purposes because "they are

capable of doing more than that." Item 72, p. 70. He concludes that even if 8 percent of the vehicles were used for other purposes, "that distinction alone would be enough to disqualify it as being a special design for one purpose only." *Id.* However, resting his conclusion on this one fact, which relates more to use, not design, while disregarding other more salient facts, such as the actual design of the horizontal material discharge system, causes the court to consider his opinion unreliable and unhelpful to the matters at issue. In his deposition, somewhat contradictorily, he agreed with the statement that how a particular contractor uses a particular vehicle does not affect the actual design of the vehicle. Item 72, p. 85. What is more, he opined that even assuming that the semitrailers have an elaborate and expensive unloading system, making it impractical to purchase the units for highway hauling, they would not meet the regulatory exception. Item 72, p. 68. Once again, he did not provide a basis to support his answer.

In conclusion, the court finds that the CB–4000 is specially designed for the primary function of transporting a particular type of load other than over the public highway in connection with a construction operation (building or resurfacing highways). The government has failed to raise a genuine issue of material fact regarding the special design of the CB–4000.

## B. Is the CB–4000 substantially limited or substantially impaired?

Upon finding that a vehicle is specially designed, the second part of the test set forth in the regulation requires a finding whether the use of such a vehicle to transport such load over the public highways is substantially limited or substantially impaired. § 48.4061(a)–1(d)(2)(ii). The regulation states that "account may be taken of whether the vehicle ... requires a special permit for highway use, is overweight ... for regular use, and any other relevant considerations." *Id.*

Gateway argues that the CB–4000 units are substantially limited/impaired because they require a permit to be operated to capacity on state roads, and because the units are parked for approximately six months per year due to state regulations that limit the asphalt paving season from May 15 to the Saturday after October 15. Gateway also argues that the cost and maintenance of the units, particularly in comparison with dump trucks, make it impractical to purchase and operate them for uses other than highway construction.

For its part, the government points out that the state paving regulations setting the times that roads may be built/resurfaced with asphalt do not apply to city, county, or private paving jobs, although many of these entities follow state regulations. The owners can use the units for as much as seven months of the year for paving, and during the winter for a variety of jobs such as transporting stone, dirt, gravel, sand, and salt. The government argues that climate restrictions have no relation to the test set out in the IRS regulations, and that the speed and distance the vehicles travel indicate they are not substantially limited. The government also states that the issuance of special permits for highway use when the unit is filled to capacity indicate that such highway use is contemplated and permissible. Finally, it contends that the argument that economics would obviate using the CB–4000 on the highway does not take into consideration the broad spectrum of factors, such as depreciation, which set forth the profitability function. Item 76 pp. 8–12.

The regulations do not define "substantially," "limited," or "impaired." The gov-

ernment cites *Webster's Ninth New College Dictionary* for the definitions of "limit" and "impairment" as suggesting "meanings equivalent to restriction and reduction, respectively." Item 30, p. 3, n. 1. It posits that the word "substantially" suggests "an order of magnitude equivalent to 80% or 90%." *Id.* It concludes that "[u]sing those definitions, 'substantially limited' and 'substantially impaired' means that there must be an 80%–90% restriction and/or reduction of use by virtue of the design of the CB–4000." *Id.*

While the court agrees that the meanings of limitation and impairment refer to restriction and reduction, it does not agree with the uncited definition of "substantial" as an order of magnitude equivalent to 80 or 90 percent. *Random House Unabridged Dictionary* 1897 (2d ed.1993) defines "substantial" as "of ample or considerable amount quantity, size," a much less precise definition than offered by the government. It is clear that the CB–4000 can and does transport its load over the public highway in the course of traveling to a job site. The question is whether that transportation function is substantially limited by its special design in the type of material it can haul, and whether there are other factors that substantially limit/impair its use for over-the-road distance hauling.

## 1. Permits

The regulations specifically provide that a fully loaded CB–4000 requires a permit[13] to travel over New York roads. The court considers this fact as one factor leading to a finding that the unit is substantially im-

paired/limited. The CB–4000 was specifically designed to carry a maximum load of approximately 33 tons. Item 4, Ex. Q, ¶ 12. With a gross vehicle weight of 104,000 to 108,000 pounds,[14] a loaded CB–4000 would be in violation of New York public highway weight laws, which limit vehicle weight to 80,000 pounds. Item 61, p. 11. The CB–4000 unit must carry a maximum payload to be profitable. Item 20, p. 25. The contractors assert that it would be uneconomical to carry a payload of 20 tons, which would enable the unit to travel on the highway without a permit. Item 20, pp. 33–35; Item 53, pp. 30–31; Item 54, pp. 36, 38–39; Item 55, pp. 36, 40; Item 57, pp. 35–37; Item 63, pp. 26, 28; Item 64, pp. 53–55; Item 65, pp. 57, 59; Item 66, pp. 64, 90.

As plaintiff points out, there is a great deal of authority for the finding that a permit is a factor that makes the CB–4000 "substantially limited." Item 78, p. 12. Revenue Ruling 77–141 deals with whether a semitrailer for off-highway hauling of heavy oil field equipment was subject to the excise tax. The IRS considered the special permit the semitrailer required for exceeding highway weight specifications set by the state in which the units were operated, and found that the semitrailers were specially designed and their use on the highway was substantially limited. Item 78, Ex. A. The IRS also took note that the increasing cost of the permits depending on the increasing weight of the semitrailer made operation of the semitrailers for non-specialized use "not nor-

---

**13.** These permits are called divisible load permits, and the statute that governs their application is New York State Vehicle and Traffic Law, Section 385. Item 67, pp. 9–11. A Type 1A permit costs $750.00 and allows a maximum gross weight up to 102,000 pounds for one semitrailer and one tractor (which pulls the semitrailer). A Type 7 permit,

which allows a maximum gross weight of 107,000 pounds, costs an additional $65.00, for a total of $815.00. Item 67, pp. 22–23.

**14.** This figure is arrived at by adding the empty trailer weight of 20,000 pounds, the tractor weight of 20,000 pounds, and the 32-to-34-ton payload.

mally considered to be an economically feasible business practice." *Id.*

In addition, the *Flow Boy* circuit court decision tied together the permit requirement with the fact that the ST–1000 unit had to be operated at capacity to be operated efficiently. It found that the jury properly credited testimony that "the Flow Boy could not legally travel over the highways if it was carrying a load to its capacity." *Flow Boy, Inc. v. U.S.*, 1984 WL 15513, \*2 (10th Cir. Jan. 20, 1984). The Flow Boy designer testified that if the Flow Boy could not carry a full load, it would not be operated efficiently and profitably. *Id.* The jury was entitled to credit that testimony and to conclude that the design was such that its over-the-highway use was substantially limited or substantially impaired." *Id.*

### 2. Economics of Operation

Gateway argues that the cost of purchasing and operating a CB–4000 unit, in comparison to a dump truck, makes it impractical to operate it for uses other than for highway construction, and this is a substantial limitation.

The IRS General Counsel Memorandum ("GCM") dated January 26, 1979, is particularly helpful and significant. Item 78 Ex. B. In it, the General Counsel's Office considered a proposed ruling concerning whether a manufacturer's sales of a specially designed dump body railroad maintenance vehicle were subject to the excise tax, *i.e.*, whether it fit the two-part test set forth in the regulations. Noting that the language referring to the exceptions in Treas. Reg. § 48.4061(a)–1(d)(2) does not permit consideration of the economics of *purchase*,[15] the General Counsel went on

to say that economics of *operation* can be considered.

However, we believe that the economic feasibility of *operating* a vehicle to transport loads over public highways is relevant in applying Treas. Reg. § 48.4061(a)–1(d)(2)(ii). *This is because it can reasonably be said that if it is not economically feasible to operate a vehicle to transport a load over the public highways, its use for such purpose is substantially limited or substantially impaired for purposes of Treas. Reg. § 48.4061(a)–1(d)(2)(ii).* See Rev. Rul. 77–141, 1977–1 C.B. 317, considering the economic feasibility of operating certain semitrailers on public highways in finding them to be nonhighway vehicles under that regulation.

Item 78, Ex. B, p. 5 (emphasis added). The General Counsel went on to find that the vehicle was overweight for highway use and could not be economically operated without being fully loaded, and thus was substantially limited pursuant to the regulation.

The same analysis can be applied in this case, given that a fully loaded CB–4000 has to be operated with a permit, and it has to be fully loaded to be economically operated. Item 40, Riccelli Aff., ¶ 8; ¶ 8 of Items 42, 47–49. It is "overweight ... for regular use ...." 26 C.F.R. § 48.4061(a)–1(d)(2)(ii). Thus, the permit and the cost of operation are two factors that make the CB–4000 substantially limited.

Further, in terms of the economics of operation, contractors indicated that they are in business "to figure out a way to do [their work] cheaper." Item 66, p. 108. In this regard, they use the Flow Boys

**15.** Nevertheless, in both *Halliburton Co. v. United States*, 611 F.Supp. 1118 (N.D.Tex. 1985), and in *Flow Boy v. United States*, 1984 WL 15513 (10th Cir. Jan. 20, 1984), the courts considered cost of acquisition of the unit at issue as a relevant fact in determining whether the units were substantially limited/impaired.

only near hot-mix plants because they cannot afford to haul their loads of hot-mix asphalt long distances. Item 66, p. 73; Item 54, p. 18 (within a 30-mile radius); Item 55, p. 18 (within a 40-mile radius); Item 62, p. 34 (within a 20-mile radius); Item 64, p. 11 (within a 10-to-25-mile radius); Item 66, p. 44 (within a 20-to-30-mile radius); Item 73, p. 33 (within a 12-to-15-mile radius). During construction season, the Flow Boys travel 20,000 miles per year, while a dump truck may travel 50,000 miles per year. Item 53, p. 26; Item 65, p. 48. Furthermore, the insulation, which is part of the unit's special design, also makes the use of the Flow Boy substantially limited in terms of cost. Item 20, p. 22. Similarly, contractors testified that they would not operate the Flow Boy for regular hauling because it is too expensive and impractical to do so. Item 55, pp. 34–35; Item 66, p. 97.

In an attempt to negate the plaintiff's cost-limitation argument, the government argues that factors such as "depreciation deductions ..., maintenance costs, labor costs, accurate permitting costs, or any other cost breakdown analysis which accurately sets forth the profitability margin on the CB–4000 semi-trailers" were not considered, and therefore, the conclusion is not warranted. Item 76, p. 12. Not only does the court find defendant's objection too technical, but it notes that there are numerous references in the record where experienced contractors considered maintenance and labor costs and other factors when assessing whether the cost of operating the Flow Boy on a particular job allowed them to make a profit. Item 20, p. 25; Item 54, pp. 23–24; Item 66, p. 82.

### 3. Equipped for Highway Travel

The government argues that because the CB–4000 can travel at the speed limit over

the public highways, Item 65, p. 69, an item mentioned in the regulation, it is not substantially impaired. It also argues that the distance it travels per year does not make it substantially limited. However, the court finds a statement originally set forth in the transmittal memorandum for the final draft of the regulations [16] dated August 21, 1975 (and quoted in GCM 37833 dated January 26, 1979) as providing a particularly salient insight on the regulations. The draft of the final regulations pointed out that

> in the case of each of the three forms of vehicles [excepted from the general definition of highway vehicle], *the underlying principle is that such vehicles are so designed that they will spend most of their functional time off the highway performing tasks unrelated to highway transportation, although they are capable of operating on, and will make occasional use of, the public highways.*

GCM 37833 at page 4, attached to Item 78 as Ex. B (emphasis added). As indicated, *supra,* contractors estimated that the Flow Boy spends approximately 65 to 70 percent of its time off the highway, engaged with the laydown machine in highway construction/repaving. Item 57, pp. 43–44; Item 65, pp. 65–66, 68. They all agreed that travel over the highway to get to the job was incidental in the context of the actual work the Flow Boy performs. Item 20, p. 21; Item 21, pp. 63–64; Item 53, p. 35; Item 55, p. 44; Item 57, pp. 42–43; Item 63, p. 32; Item 64, pp. 60–61; Item 65, p. 63; Item 66, p. 96.

In this regard, GCM 37833 explained the interplay between the regulation's definition of highway vehicle and the exceptions. A highway vehicle covers a broad range of conveyances since,

---

**16.** GCM 37833 noted that the language contained in the draft was substantially similar to the published version of the regulations. Item 78, Ex. B, p. 8 n. 3.

absent the exceptions the vehicles described in the exceptions would be highway vehicles-and, thus, that such vehicles do satisfy the design test in the general definition-because they have the capability to operate on and transport loads over public highways. In our view such capability is the only requirement for a vehicle to be a highway vehicle under the general definition.

Item 78, Ex. B, p. 4.

The GCM goes on to explain that the definition is broad, since very few conveyances that travel on the road would not be considered a highway vehicle.

Under this formulation only vehicles with no or negligible utility for transporting loads on public highways fail to meet the design test in the general definition of highway vehicle. Examples of such vehicles include farm tractors, trench diggers, power shovels, bulldozers, road graders or rollers, vehicles that move exclusively on rails, and forklift trucks. Vehicles with greater utility for highway transportation must come within one of the exceptions . . . .

Item 78, Ex. B, p. 4.

The issue here is whether the Flow Boy, with a "greater utility for highway transportation," *id.*, fits the exceptions. Simply because a highway vehicle is equipped to and does travel thousands of miles a year over the public highway does not mean, as the government contends, that the CB-4000 has "an important highway transportation function" which overrides the exceptions to the regulation. Item 76, p. 11. The question is whether, per the transmittal memorandum, the vehicles spend "most of their functional time off the highway performing tasks unrelated to highway transportation." Item 78, Ex. B., p. 4. The record in this case shows that this question is answered, as a matter of law, in the affirmative.

Case law also supports this kind of allocation of a vehicle's functional time as a factor to be considered in the substantial limitation/impairment assessment. In *Halliburton Co. v. United States,* 611 F.Supp. 1118 (N.D.Tex.1985), the district court determined that various vehicles used by Halliburton Company and Otis Engineering Corporation were not highway vehicles and were exempt from the excise tax. Regarding one of the machines, a mobile mount for oil well service equipment, the evidence showed that "[a]pproximately 2/3 of the units' time is spent at jobsites and 1/3 is spent in transit." *Id.* at 1120. The average distance to and from a job site was "90 miles round trip with a significant portion of the distance traveled on public highways." *Id.* The court found that "[w]hile plaintiffs' units do use the highway regularly, the units are primarily designed as off-highway vehicles and are predominantly used for an off-highway function." *Id.* at 1121.

The court noted that while the units were designed to travel on the highway without a special permit, their standard features, such as walking beam suspensions, power takeoff units, and maximum cooling radiators, made the units "heavier and more costly to operate than exclusively highway units." *Id.* "Without these brackets and subframes, the frame rail configuration resembles that of Halliburton's truck chassis and can be used as a flatbed trailer to carry heavy loads." *Id.* at 1123. Importantly, the court found that "it would not be economically feasible to utilize one of Halliburton's trailers as a flat bed," given that the cost of acquisition and operation was substantially greater than that of a regular highway use vehicle with similar capabilities and capacities. *Id.* at 1123.

The units at issue here and those in the *Halliburton* case are similar, in that even

though each one could be operated over the highway, such travel was necessary in order to arrive at the job site. It was at the job site that the machine's function was predominantly performed. The Halliburton unit *could* conceivably be operated as a flatbed to carry heavy loads for over-the-road travel. However, the practicalities of such operation, and in particular the cost, made its use impractical and unprofitable.

### 4. Climate

The plaintiff alleges that the fact that the CB–4000 units are parked for approximately six months in the wintertime also represents a substantial limitation. The government addresses this argument in the context of the design element of the regulation, countering that "[c]limate restrictions such as the regulated paving season in New York is not a design restriction." Item 76, p. 9.

As found previously, the units are specially designed to feed hot asphalt to a paving machine during highway construction/resurfacing operations. Contractors are limited by state regulation to laying asphalt on state jobs from May 15 to the first Saturday after October 15. Item 21, p. 76. Many city and county highway jobs follow the same schedule. Item 63, p. 12. When it is too cold, the asphalt cannot be laid at the proper temperature to meet specifications. As a result, the units cannot be operated for asphalt highway construction during the winter months. Consequently, the great majority of the contractors park their units during the winter. Item 4, Boehmer Aff., ¶ 8; Item 54, p. 20; Item 55, p. 17; Item 62, p. 48; Item 63, p. 16; ¶ 9 of Items 40–49. According to Gateway General Manager Richard Sheridan, the climate restrictions on hot-mix asphalt construction make the unit limited "[f]or the purpose

for which it is designed, absolutely." Item 21, p. 76. Except for one or possibly two contractors, most who were deposed do not use their units for other functions in winter because they are too expensive to operate when compared with a dump truck, which has all-season functionality and no limits on what it can carry. Item 58, p. 39; Item 62, p. 48.

The government asserts that "owners of CB–4000 semi-trailers also use the semi-trailers during the winter for a variety of jobs such as transporting stone, dirt, gravel and sand, as well as spreading salt on winter roads." Item 76, pp. 8–9. As support for this assertion, defendant cites the deposition of Frank Rose, Item 57, p. 107, and Richard Riccelli, Item 65, pp. 15–16. While Mr. Rose stated that he carries (not spreads) salt in the winter months, he went on to say that he uses the CB–4000 for hauling salt 15 percent of the time, Item 65, p. 11, and that salt damages the trailer. *Id.* p. 12. Mr. Riccelli was more equivocal, stating that he used the trailers during the off season, "but the majority of the off season, they are just parked." Item 65, p. 15. The testimony of Mr. Rose provides minimal support for the government's statement that the climate does not present a limitation on use of the units. However, this evidence is not sufficient to raise a question of material fact that the climate does not substantially limit the operation of the CB–4000. In conclusion, I find that due to the special design of the CB–4000 for a payload of hot-mix asphalt, the climate imposes a substantial limitation in its operation.

### 5. Limited Payload

The government argues that the units "are not specially designed to carry a particular kind of load" since they can carry dirt, salt, sand, and aggregate stone varying in size from 1/8 of an inch to 3 inches

in length, in addition to hot asphalt. Item 76, p. 7. Although the operators use the units to transport hot-mix asphalt for the majority of time, "as much as 25% of the time the CB–4000 owners use the semi-trailers to transport materials other than hot mix asphalt." *Id.* Furthermore, the government points out that the promotional material advertises that the trailer can carry " 'aggregate and crusher material, hot-mix asphalt, sand, salt, low-slump concrete, recycled asphalt . . . .' " *Id.,* quoting Item 4, Ex. Q. The defendant's expert summarily concludes that if the units can carry other materials as much as 8 percent of the time, that means it is not substantially limited. Item 72, p. 70.

Plaintiff claims that it "has never contended that the CB–4000 units do not carry other construction materials." Item 78, p. 20. It argues that the contractors often carry aggregate or sand from the plant to the job site or on a "back haul", which results in the same situation as delivering hot-mix asphalt: "the delivery ends up off highway i.e. between the barricades." *Id.;* see Item 52, pp. 40–41; Item 66, pp. 50, 74–75.

The record shows that most of the contractors, if they carry additional materials in the CB–4000, do so from 1 to 10 percent of the time. Only two carry materials other than hot-mix asphalt as much as 20 to 25 percent of the time. This is not enough to find a question of material fact that the unit is not substantially limited. It is clear that the special design, especially the horizontal discharge system, substantially limits the payload that the units can carry, when compared with dump trucks. Though some contractors may on occasion carry materials that have small diameters (*e.g.,* aggregate less than 2 inches, salt, sand), when compared to dump trucks, the units are still substantially limited in terms of what they can carry due to the design limitations (*i.e.,* the discharge system), cost factors (maintenance, repair, fuel and operation costs), and climate.

One contractor did not even like to haul sand and gravel in the Flow Boys, stating, "it's difficult to clean them if they've been hauling aggregate and sand and then turn around and use them for hauling blacktop. Just the nature of the equipment or the conveyor belts. They aren't as versatile as dump trucks, they're more of a one-use piece of equipment, which is hauling blacktop." Item 54, pp. 23–24. Another contractor opined, "[i]t does not have the versatility of a dump trailers [sic], which is why the vast majority of the hauling industry buys dump trailers." Item 21, p. 75.

### 6. Expert Report and Testimony

The government's expert's report and deposition testimony are unhelpful. Mr. Hagelthorn concludes that the Flow Boy CB–4000

> is designed to transport a full capacity payload and is 'limited' only by the need to comply with the Maximum Allowable Gross Weight Limitations prescribed by the Department of Transportation regulations and standard State restrictions with regard to special overweight permits in the same manner as any other highway semitrailer operating over public highways.[17]

---

17. In his deposition, Mr. Hagelthorn states that the CB–4000's loaded weight of 104,000 pounds, making it illegal to travel over New York highways, has "nothing to do" with finding the unit is substantially limited, because that is a "use consideration" not a "design consideration." Item 72, p. 47. This shows a misunderstanding of the statute. Whether a unit is overweight is specifically mentioned in the regulation for purposes of applying the rule. *See also* Item 72, p. 72.

Item 69, p. 1. Apparently, he discounts the text of the regulation that provides that an overweight permit *is* a fact to be considered in the determination of whether a vehicle is substantially limited/impaired. He adds that it is not "substantially impaired for any reason that would preclude its use for transporting sand, gravel, or low slump concrete over public highways." [18] *Id.* This conclusion, too, is not significant, given that there is really no dispute that the machine *can* carry these materials. Mr. Hagelthorn's report and deposition testimony does not assist the court in its attempt to understand the evidence or determine a fact in issue. Fed.R.Evid. 702; *Bunt v. Altec Indus., Inc.,* 962 F.Supp. 313, 317 (N.D.N.Y.1997). It appears that Mr. Hagelthorn has arrived at a legal conclusion in the guise of expert opinion, to which the court does not accord much weight.

### 7. Case Law

The only case cited by the government in support of its position is *Liquid Asphalt Systems, Inc. v. United States,* 555 F.Supp. 1100 (W.D.Mo.1982).[19] In *Liquid Asphalt Systems,* the district court found that a job tanker that provided roofing contractors with a more convenient and economical means of supplying hot liquid asphalt to roofing job sites was subject to the excise tax, while the heating system attached to the unit was not subject to the tax. In analyzing whether the tanker was substantially impaired, the court found that although the loaded tankers could not be driven faster than 40 miles per hour, and that some models were overweight in a number of states, there was no limitation

as to how far it was practical for a loaded tanker to travel. *Id.* The designer of the unit, and president of the plaintiff company, testified at the bench trial that the units could be driven "around the world." *Id.* at 1105. The court concluded that the units were not substantially limited or impaired.

In this case, however, sufficient evidence has been submitted showing that it is not practical to drive the Flow Boys long distances, *i.e.,* they are not driven more than a maximum of 50 miles to a job, with most jobs within a 10–to–25–mile distance. In addition, the fully loaded units require permits, a fact to which the *Liquid Asphalt Systems* court paid only scant attention. The court distinguishes *Liquid Asphalt Systems* on its facts, and does not accord it any persuasive value.

### 8. Conclusion

The court finds that the Flow Boy CB–4000 is substantially limited and/or substantially impaired because of its special design: the unit requires a permit to travel fully loaded on New York State highways, the design and cost of operation make it impractical to use the unit for highway hauling, and the climate substantially limits its use for approximately six months of the year. The government has failed to raise a genuine issue of material fact, and the plaintiff's motion for summary judgment on the design issue is granted.

### III. Fairness

 Gateway's second argument in support of summary judgment is that the

---

**18.** Mr. Hagelthorn did agree that carrying stone heavier than a "number two" would be economically disastrous because of damage to the insulated sidewalls. Item 72, p. 83.

**19.** The other cases cited by the government concern cases cited by plaintiff, which discuss

taxability in the context of regulations in effect prior to January 1977. Item 76, pp. 5–6. The test for taxability in those cases was a "primary design" test, which has been superseded and is thus inapplicable in the case at bar.

government's denial of its FET refund request was unfair and discriminatory, since it had the effect of treating similarly situated taxpayers differently. In essence, Gateway argues that it pays the excise tax on the same CB–4000 machine that other distributors don't pay, and that this inconsistency in treatment has no rational basis. This disparate treatment has penalized Gateway and favored the other taxpayers with a "significant competitive and financial advantage." Item 5, p. 12. Gateway asserts it has been injured, for example, because it could have sold Flow Boys to Lancaster Development, located in Oneonta, New York, which instead bought the Flow Boys, without having to pay excise tax, directly from Flow Boy Mfg. Item 21, p. 28. Gateway was also injured because it had a competitor "down the street selling a competitive product [Red River] and not charging the tax." *Id.* p. 31, 33–35. Gateway lost sales to Red River because of price. *Id.* p. 58–59. Then, in order to remain competitive, Gateway had to reduce the price for which it sold the CB–4000, which cut into its profit margin. *Id.* p. 31.

The government asserts that it has "a right to continue to seek a favorable ruling in circuits not bound by an earlier unfavorable ruling." Item 17, p. 17. It also claims that it has consistently taken the position that the CB–4000 is subject to the excise tax, and that the *Flow Boy* case was wrongly decided. *Id.* p. 16. However, it did not submit any evidence, in the form of affidavits or other documents, to substantiate its position.

The doctrine of equality of treatment provides:

Although an agency may make rules and may exercise discretion in that regard, it is bound by some requirement of equality-that is, it must treat similarly situated persons equally.... If one party is treated differently than another similarly situated party, the agency must state the reasons for the apparent inconsistency.

M. Saltzman, *IRS Practice & Procedure,* ¶ 1.06[2] (2001). In *Jones v. Califano,* 576 F.2d 12, 20 (2d Cir.1978), the Second Circuit tied this court-imposed duty of consistency toward similarly situated taxpayers to the fundamental ingredient of justice: equality of treatment.

Gateway relies on *Int'l Business Machines Corp. v. United States,* 170 Ct.Cl. 357, 343 F.2d 914 (1965), *cert. denied,* 382 U.S. 1028, 86 S.Ct. 647, 15 L.Ed.2d 540 (1966) ("IBM"), which holds that "[f]or all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis .... Parity in the levying a manufacturers' excises is peculiarly essential to free and fair competition." *Id.* at 923. "The Commissioner cannot tax one and not tax another without some rational basis for the difference." *Id.* at 920.

In *IBM,* an IBM competitor, Remington Rand, requested a ruling from the Commissioner that certain of its computing devices were not subject to the excise tax. Rand received a favorable private ruling two days later. IBM then urgently sought a similar private ruling for its competing computer that was identical in all significant respects to the Rand computer. The Commissioner did not act on IBM's request for over two years, during which time IBM continued to pay the excise taxes and Rand did not. Rand also received a refund for previous years that it had paid excise taxes; IBM did not. IBM sued.

The *IBM* court grounded its holding on fairness. Implicit in the discretion provided to the Commissioner by Section

7805(b),[20] the court held that courts must also "consider the totality of the circumstances surrounding the handing down of a ruling, including the comparative or differential effect on the other taxpayers in the same class.... Equality of treatment is so dominant in our understanding of justice that discretion, where it is allowed a role, must pay the strictest heed." *Id.* at 920. The history between the two companies, selling almost identical products, where one paid the excise tax and the other did not, "exposes a manifest and unjustifiable discrimination against the taxpayer." *Id.* at 923. Further, "[t]he inequality inheres in the payment of the tax by IBM and its customers while Remington and its customers were allowed to go free. The injury lies in the collection of taxes which are now found not to have been collectible." *Id.* at 924.

"Although the Court of Claims held that the Service abused its discretion under Section 7805(b) in revoking Remington–Rand's ruling prospectively, the rationale was one of equality of treatment." Saltzman, *supra; see also Bunce v. United States,* 28 Fed. Cl. 500, 509 (1993) ("In exercising its interpretive discretion, the IRS might have the discretion to decide whether or not an item is taxable, but once that decision is made, it must be applied equally to all taxpayers"), *aff'd,* 26 F.3d 138 (Fed.Cir.), *cert. denied,* 513 U.S. 1043, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994); *Ogiony v. Commissioner,* 617 F.2d 14, 18 (2d Cir.) ("It is my view that consistency over time and uniformity of treatment among taxpayers are proper benchmarks from which to judge IRS actions."), *cert.*

*denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980).

Another case cited by plaintiff, *Sirbo Holdings, Inc. v. Commissioner,* 476 F.2d 981 (2d Cir.1973), concerned two taxpayers who did not receive similar capital gains treatment. The court noted that the "Commissioner has a duty of consistency toward similarly situated taxpayers; he cannot properly concede capital gains treatment in one case and, without adequate explanation, dispute it in another having seemingly identical facts which is pending at the same time." *Id.* at 987.

The government first attempts to distinguish the cases cited by plaintiff by noting that those cases involve situations where the Commissioner took different positions on identical issues at the administrative level. However, the government claims here that it has consistently taken the position that the CB–4000 is subject to the FET and that *Flow Boy* was wrongly decided. Item 17, p. 16. In fact, the evidence submitted by plaintiff reveals that the IRS *has* taken opposite administrative positions by allowing refunds to three other distributors,[21] and not allowing refunds to Gateway. These distributors are located outside the Tenth Circuit, where the *Flow Boy* case was decided. All that can be gleaned from the record concerning the IRS's rationale is a glancing reference in a letter from the IRS provided by plaintiff that characterizes the decisions in providing refunds to Critzer, Ranchers, and McLean as "administrative settlements." Without any evidence from the government opposing Gateway's characterization of those decisions as administrative, there is no material issue of fact in dispute on

---

**20.** 26 U.S.C. § 7805(b) provides: "The Secretary may prescribe the extent, if any, to which any ruling or regulation relating to the internal revenue laws, shall be applied without retroactive effect." The section has been amended since *IBM* was decided, but the Secretary continues to have discretion to determine what regulations may be applied retroactively.

**21.** Critzer, Ranchers and McLean.

that point, and it is apparent that the government *did* take opposite positions on identical issues at the administrative level. The IRS fails in attempting to distinguish this case from *IBM* and other cases cited by plaintiff "where the IRS took inconsistent positions in its private letter rulings or other administrative determinations." Item 17, p. 16.

The government also seeks to distinguish *IBM* from the case at bar by limiting it to its facts, particularly as it relates to private letter rulings. It cites cases which hold that the "International Business Machine Corp. holding, as a precedent, has been severely circumscribed." *Easter House v. United States*, 12 Cl.Ct. 476, 489 (1987) (citing *Knetsch v. United States*, 172 Ct.Cl. 378, 348 F.2d 932, 940 n. 14 (1965)), *cert. denied*, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966). *Knetsch* concerned taxpayers who received and relied on private rulings issued to them concerning an annuity scheme, as compared with taxpayers who neither applied for nor received a ruling of their own but relied solely on the aforementioned private ruling issued to the other taxpayers. However, the law clearly states that private rulings cannot be used as precedent. The *Knetsch* court then mentioned *IBM* in a footnote, noting that *IBM* related to a different section of the tax code and describing the result as "based on the court's evaluation of the particular circumstances in that case." *Knetsch*, at n. 14. This court reads that assessment more as a statement that the subject matter and applicable tax code sections were different in the *Knetsch* and *IBM* cases, as opposed to limiting IBM to its facts.

The final point to consider in the fairness argument was articulated in *Sirbo*. The Second Circuit wrote "the Commissioner has a duty of consistency toward similarly situated taxpayers; he cannot properly concede capital gains treatment in one case and, without adequate explanation, dispute it in another having seemingly identical facts which is pending at the same time." *Sirbo*, 476 F.2d at 987; *see also United States v. Kaiser*, 363 U.S. 299, 308, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring) ("The Commissioner cannot tax one and not tax another without some rational basis for the difference.").

The explanation proffered by the IRS in this case is that it has a right to continue litigating its position until it secures a favorable opinion or until the Supreme Court grants *certiorari*. *United States v. Mendoza*, 464 U.S. 154, 163, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *Divine v. Commissioner*, 500 F.2d 1041, 1048–49 (2d Cir. 1974). That is an accurate explanation of options available to the IRS. However, it is not a rational explanation of why the IRS has treated Gateway different from other CB–4000 distributors.

The overarching philosophical message of treating similarly situated taxpayers alike has a certain logic when applied to the case at bar: CB–4000 distributors in different parts of the country are exempted from paying the FET on the same machine while the plaintiff is not. Furthermore, excise taxes are not assessed against Flow Boy's competitor, Red River, which manufactures a similar horizontal materials discharge system. Item 4, Ex. E, ¶¶ 13, 14. In addition, excise taxes have never been assessed against the ST–1000 model which, except for the configuration of the belt, is "identical ... in all major respects" to the CB–4000. Item 6, ¶ 9. Even the government's expert agreed that the CB–4000 and the ST–1000 were substantially the same trailer, except for the rubber belt. Item 13, Ex. B, p. 10.

This case does not involve state taxes, where some tax disparity may be expected.

It involves federal taxes, and there appears to be no rational basis for taxing similarly situated taxpayers differently. Because the IRS has offered no explanation for its position, and because Gateway has clearly been treated differently from other similarly situated taxpayers, the court grants summary judgment to Gateway on this issue.

## IV. Collateral Estoppel

■■■■ Gateway also argues that mutual offensive collateral estoppel[22] may be used against the government, and that the doctrine would bar the defendant from litigating the identical issue in this case as was presented and decided in *Flow Boy Inc. v. United States, supra.* For its part, the government submits that collateral estoppel does not apply here because (1) Gateway was not a party to the *Flow Boy* litigation, nor was it in privity with Flow Boy, Inc.; and (2) the facts in the case at bar are sufficiently different from those in the *Flow Boy* litigation such that material facts are in dispute or, at minimum, "subject to varying appraisals" by a jury. *Divine v. Commissioner,* 500 F.2d 1041, 1048–49 (2d Cir.1974).

Collateral estoppel, or issue preclusion, prohibits the relitigation of matters that have actually been litigated or decided in an earlier action between the same parties. *Zimmermann v. Frederic R. Harris, Inc.,* 1997 WL 257478, *2 (S.D.N.Y. May 15, 1997). At one time, the rule of mutuality dictated that neither party could use a prior judgment against the other unless both parties were bound by the same judgment. In *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 324–26, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Court dispensed with strict mutuality between parties as a necessary basis to invoke collateral estoppel. While *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), "made the doctrine of mutuality effectively a dead letter under federal law," *Hardy v. Johns–Manville Sales Corp.,* 681 F.2d 334, 338 (5th Cir. 1982), *Parklane* left undisturbed the requisite of privity, *i.e.,* that collateral estoppel can only be applied against parties who have had a prior " 'full and fair' opportunity to litigate their claims ...." *Parklane,* 439 U.S. at 332, 99 S.Ct. 645, *quoted in Hardy v. Johns–Manville Sales Corp.,* 681 F.2d at 338; *see also Richards v. Jefferson County, Ala.,* 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996).

In this circuit, "[w]hether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions." *Chase Manhattan Bank N.A. v. Celotex Corp.,* 56 F.3d 343, 346 (2d Cir.1995). Courts have examined whether the relationship between the party and nonparty is "sufficiently close" to support preclusion, *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 640 (2d Cir.1987), and whether the interests of the nonparty are represented by a party to the litigation who is "vested with the authority of representation ...." *Phillips v. Kidder, Peabody & Co.,* 750 F.Supp.

---

**22.** "Offensive use of collateral estoppel occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza,* 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). Under the mutuality doctrine, there had to be an identity of parties in the original and subsequent litigation. "[N]either party could use a prior judgment as an estoppel against the other unless both parties were bound by the judgment." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326–27, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

603, 607 (S.D.N.Y.1990) (citing *Alpert's Newspaper Delivery Inc. v. The New York Times Co.*, 876 F.2d 266, 270 (2d Cir. 1989)). Federal courts have deemed several types of relationships "sufficiently close" to justify preclusion, including (1) whether the nonparty was a *successor-in-interest* to the original party; (2) whether the nonparty *controlled* the original suit; and (3) whether the interests of the nonparty were *adequately represented* by a party in the original suit. 18 *Moore's Federal Practice* § 132.04[1][b][iv] (Matthew Bender, 3d ed.) (emphasis added).

## A. Successor-in-interest

■ Gateway asserts that as of April 1, 1983, it "became the successor in interest to Flow Boy stepping into Flow Boy's shoes as the entity required to collect and pay over federal excise tax." Item 5, pp. 6–7. However, such a relationship does not describe a successor-in-interest. Under New York common law, a successor-in-interest is found if there was consolidation or merger of seller and purchaser, or if the purchasing corporation was a mere continuance of the selling corporation. *Baker v. Dorfman, P.L.L.C.*, 2000 WL 1010285, * 4 (S.D.N.Y. July 21, 2000), *aff'd*, 232 F.3d 121 (2d Cir.2000). The relationship between Gateway and Flow Boy does not evidence any of the indicia of corporate successorship.

## B. Control over Litigation

It is important to consider whether Gateway exercised the requisite control over the previous litigation such that it would be bound by the *Flow Boy* judgment. " '[W]hen nonparties assume control over litigation in which they have a direct financial interest and then seek to redetermine issues previously resolved,' they are held to be in privity with the previous party." *Zimmermann*, 1997 WL

257478 at *3 (citation omitted). Control has been described variously as where a nonparty was "the admitted mastermind and financier" of both litigations, *Alpert's Newspaper Delivery, Inc.*, 876 F.2d at 270; where the board of directors acted in a fiduciary capacity when it represented the shareholder's interest, *Amalgamated Sugar Co.*, 825 F.2d at 641; and where the nonparty was present in court throughout the trial, attended conferences in chambers, and was the original party's principal witness. *Kreager v. General Elec. Co.*, 497 F.2d 468, 472 (2d Cir.1974). Citing the *Restatement (Second) of Judgments* § 39, comment c (1982), the court in *Johns–Manville* described a nonparty's control of litigation as requiring an "effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action." *Hardy v. Johns–Manville*, 681 F.2d at 339.

Gateway, in its complaint, described its relationship to Flow Boy in the following terms:

At the time of the Flow Boy suit in the Oklahoma District Court, plaintiff was notified that the excise tax issue as to the Flow Boy ST–1000 units would be litigated and that plaintiff would be bound by the outcome of the litigation. Gateway agreed with Flow Boy's position regarding the litigation of the ST–1000 units; and agreed that Flow Boy was representing the interests of Gateway in such excise tax litigation.

Item 1, ¶ 20.

The affidavit of Richard Sheridan, General Manager of Gateway, described the relationship between the two companies in greater detail:

Sometime prior to April, 1982, the date of the first Flow Boy trial, Gateway was notified by Dan Hill, President of Flow Boy, Inc. that the excise tax issue as to the Flow Boy ST–1000 units would

be litigated in the U.S. District Court, Oklahoma City, Oklahoma; that Gateway and its end-user customers would be bound by the outcome of the trial; and if the case was lost, Gateway agreed to attempt to collect the excise tax from the end-users on the ST–1000 units . . . .

Gateway's financial interest in the outcome of the Flow Boy, Inc. case rested also on the fact that if the case was lost, Gateway would be required to increase its sales price of the ST–1000 units by 10%.

Gateway agreed with Flow Boy's position regarding the litigation of the ST–1000 units; agreed that Flow Boy was representing the interests of Gateway in the excise tax litigation; and agreed that it would attempt to collect the excise tax from its end-user customers in the event the excise tax case was lost.

Item 4, Ex. A, ¶¶ 17–19.

The level of Gateway's control of the *Flow Boy* litigation was explored during the deposition of Richard Sheridan, taken December 8, 2000. Mr. Sheridan admitted that Gateway did not contribute in any way to the *Flow Boy* litigation: it never hired an attorney (Item 22, p. 165); did not sign any retainer agreements with the attorneys (*id.* pp. 157–58); did not provide any type of support, testimonial or otherwise, to Flow Boy (*id.* p. 157); and did not subsidize the *Flow Boy* case in any manner (*id.* p. 158). In essence, Gateway stayed on the sidelines and "prayed" that Flow Boy would win. *Id.* p. 166.

On this record, Gateway has not established the kind of control so as to be found in privity with Flow Boy.

**C. Adequate Representation**

Lastly, Gateway asserts that it was "adequately represented" by Flow Boy because at the time of the suit, Flow Boy was the only entity that could legally represent Gateway. The law at the time the suit was initiated, which subsequently changed during the pendency of the appeal, provided that only manufacturers, not distributors, paid excise tax. Item 5, p. 6. Sheridan, in his affidavit, explains that

At all times during the period that the first Flow Boy excise tax suit was pending, Gateway's interest in the outcome of the First Suit was identical to Flow Boy's interest since the excise tax would be added to the price of the ST–1000 units charged by Flow Boy to Gateway and, accordingly, Gateway would add the same amount to the price of the ST–1000 units charged by Gateway to its end-user customers.

Item 4, Ex. A, ¶ 20.

It is true that both Flow Boy and Gateway opposed the government's attempts to collect excise taxes on the Flow Boy equipment. In that sense, their interests were aligned. However, if the district court decision had been adverse to Flow Boy, Inc., its interests and Gateway's interests would have diverged. In such a circumstance, Flow Boy would have been liable, as the manufacturer, to pay the excise taxes. Gateway, as a distributor, would not have been liable. Flow Boy may well have decided to pass the tax on to the distributors to collect, but it still would have been responsible to the IRS for any tax liability on the equipment it had sold to distributors directly or to end-users.

When the IRS attorney probed the issue during Mr. Sheridan's deposition, the alleged community of interest between the two corporations did not prove as close as Gateway had asserted. When IRS counsel asked how, in Gateway's view, it would be "bound" to the *Flow Boy* decision, Mr. Sheridan referred to the dealership agreement between Gateway and Dan Hill & Associates, which indicated that Gateway

would be liable for taxes associated with sales. Mr. Sheridan regarded the contract liability to Dan Hill & Associates, rather than tax liability to the government, as more serious, since the contract indicated that both companies would "mutually assist" each other. Item 22, p. 161. Based on the distributorship contract, Sheridan made an additional informal "verbal agreement" with Dan Hill & Associates, in which he asserted that Gateway would try to assist by collecting the taxes from end-users if Flow Boy lost. *Id.* pp. 160–61. He added that "the odds of getting [the tax back were] slim to nil." *Id.* p. 160. Other than this franchise agreement, the two companies were independent of each other. *Id.* p. 169.

In sum, Gateway's understanding was that if Flow Boy lost, "we might have had a financial liability." *Id.*, p. 171. Sheridan "assumed" their interests were identical, *id.*, even though a state of confusion existed on the tax liability issue. *Id.* p. 159. Gateway stood on the sidelines, albeit nervously, praying for Flow Boy to win. At that time, it had no direct liability for the taxes, other than an informal accord that it would try to collect tax from end-users if Flow Boy lost.

Based upon this record, Gateway cannot successfully argue that its interests were "adequately represented" by Flow Boy.

## D. Virtual Representation

Gateway also asserts that it was represented by Flow Boy in the Oklahoma litigation based on the doctrine of "virtual representation." Item 24, pp. 10–14. Under this principle, "if the interests of a nonparty are represented by a party to the litigation who is vested with the authority of representation, the nonparty may be bound by the judgment." 18 *Moore's Federal Practice* § 132.04[1][b][iv] (3d ed. Matthew Bender). The Due Process clause also limits this doctrine, permitting

a judgment to bind a nonparty only if his relationship to a party is "sufficiently close." *Phillips v. Kidder, Peabody & Co.,* 750 F.Supp. 603, 606 (S.D.N.Y.1990) (citations omitted).

Virtual representation is a doctrine closely related to privity.

The Second Circuit has recognized the application of virtual representation, albeit in a limited manner. In *Chase Manhattan Bank [v. Celotex Corp.,* 56 F.3d 343 (2d Cir.1995) ], the court stated that the virtual representation doctrine can be used against a litigant "if one of the parties to the [prior] suit is so closely aligned with his interest as to be his virtual representative."

*Zimmermann,* 1997 WL 257478 at *3 (citations omitted). Virtual representation has been found in limited circumstances where tactical maneuvering by the parties has occurred, such as where two companies took advantage of their separateness to sue the defendant twice. *Id.* at *4 (citations omitted). But given the narrow application of virtual representation, courts have noted that it is not enough to qualify for virtual representation by "persons [who] may happen to be interested in the same question or in proving the same state of facts." *Zimmermann,* 1997 WL 257478 at *3.

In *Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 839 (S.D.N.Y. 1994), the court summarized that virtual representation

requires either some form of agreement by the non-party to permit the litigant in the first suit to represent him ... or else a relationship between them that demonstrates that the litigant was authorized to represent and was in fact representing the legal interest of the non-party. "For a nonparty to be so 'closely aligned ... requires more than a showing of parallel interest or, even, a use of the same attorney in both suits.' "

*Id.* at 853–54. Virtual representation is kept within "strict confines." *Phillips v. Kidder, Peabody & Co.,* 750 F.Supp. at 607.

It is evident that the principle of virtual representation cannot be applied in this case. Beyond Sheridan's verbal accord that Gateway would attempt to collect taxes from end-users if Flow Boy lost, there is no evidence that Gateway authorized Flow Boy, Inc. to represent its legal interests. Although they both had economic interests that may have run parallel to each other, this alone does not create a basis for issue preclusion.

### E. Mutuality

Finally, Gateway asserts that mutuality, in the sense of "virtual representation," exists between it and Flow Boy. But for all the reasons discussed *supra,* the court has found that such a relationship did not exist, privity did not exist, and therefore its mutuality arguments will not succeed. Moreover, it is questionable whether, in light of *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), nonmutual offensive collateral estoppel may be used against the government in these circumstances.

Thus, the court denies Gateway's motion for summary judgment on the ground of collateral estoppel.

### CONCLUSION

Based on the reasoning set forth above, the court grants summary judgment to Gateway on the basis of the design and fairness issues, and denies summary judgment on the basis of collateral estoppel. Item 4.

So ordered.