BRIDGESTONE/FIRESTONE AMER-
ICAS HOLDING, INC., Plaintiff
and Counterclaim Defendant,

v.

UNITED STATES of America,
Defendant and Counterclaim
Plaintiff

No. 3:02–0994.

United States District Court,
M.D. Tennessee,
Nashville Division.

Aug. 23, 2004.

George H. Cate, III, Neal & Harwell, Nashville, TN, Mark P. Rotatori, James Daly, Chicago, IL, for Plaintiff/Counter–Deft.

Carrie Elizabeth Bassi, Jones, Day, Reavis & Pogue, Chicago, IL, for Plaintiff.

Michael J. Martineau, Department of Justice Ben Franklin Station, Washington, DC, for Defendant.

Jason S. Zarin, Department of Justice Ben Franklin Station, Washington, DC, for Counter–Claimant.

### MEMORANDUM ORDER

JOHN T. NIXON, Senior District Judge.

Pending before the Court is Plaintiff and Counterclaim Defendant Bridgestone/Firestone Americas Holding, Inc.'s ("Plaintiff" or "BF") Motion for Summary Judgment (Doc. No. 26). Defendant and Counterclaim Plaintiff United States of America ("Defendant") has filed a response in opposition (Doc. No. 35), and BF has filed a reply (Doc. No. 39). For the reasons stated below, BF's motion is DENIED.

### Background

Plaintiff sells and markets a tire, the Series L317, Size 12.00R24 tire ("the

Tire"), for use in the coal, lumber, and oil-rigging industries. 26 U.S.C. § 4071(a)(1) provides for a tax "on tires of the type used on highway vehicles. . . ." The Internal Revenue Service ("IRS") did not tax the Tire from 1990–1994, but did tax it for the tax period ending March 31, 1996.[1] In 1999, the IRS began investigating whether it was appropriate to assess a federal excise tax on sales of the Tire, and in July 2000, the IRS issued a report that included proposed tax adjustments on the Tire for all quarters beginning January 1, 1995 and continuing through June 30, 2002. The IRS estimated that the total tax due for these quarters would be $2,185,330. BF submitted a Memorandum of Protested Adjustments, taking issue with the IRS's proposed adjustments. In November 2001, Defendant issued a deficiency notice to BF stating that it owed $92,792.83 in taxes and interest on sales of 8,477 tires sold in the first quarter of 1996. BF paid this amount, and on February 22, 2002, timely filed a Claim for Refund for this amount. The IRS responded by letter, fully disallowing the refund claim. BF then brought this action, seeking a refund of the $92,797.83. Defendant answered this complaint and asserted a counterclaim seeking $1,591,378 in excise taxes for the first through fourth quarters of 1995, the second through fourth quarters of 1996, the first through fourth quarters of 1997, the first through fourth quarters of 1998, the first through fourth quarters of 1999, and the first quarter of 2000. Defendant also seeks statutory interest, penalties, and additions accruing on the $1,591,378 since November 12, 2001.

The Tire has a number of design features relevant to the question of whether it is subject to the tax at issue. First, the Tire is speed restricted to 50 miles an hour ("mph"). The seven other tires in the L317 series are restricted to 55 mph. Exceeding the speed restriction on the Tire can cause internal damage to the Tire. The Tire's tread pattern consists of large tread blocks, without siping (small slits in the tread, usually seen on on-road or on/off-road tire designs), with heavily reinforced side angles. This design is most suitable for sand, mud, clay, and hard rock soils. The Tire has a high void to rubber ratio, which is also commonly found on off-road tires. The size of the Tire's tread blocks or lugs contributes to excess abrasion on-road, and the large lug size precludes sophisticated noise treatments to reduce noise levels on-road. The Tire's tread radius is less than that of most on-road tires, making it unfit for long-term on-road use. The Tire's tread depth is deeper than the other tires in the L317 series and makes it more suitable for off-road use. The Tire is designed to carry a heavier load than the other L317 series tires and cannot be operated continuously on the road for more than one hour at a time.

BF has taken other steps that it contends are relevant to the non-taxability of the Tire. First, from 1995 to 2000, the Tire's sidewall has contained the marking "NHS," meaning "Not for Highway Service." During that time, the Tire's sidewall has not contained a Department of Transportation ("DOT") marking. The Tire is the largest and heaviest of BF"s L317 tire series, and none of its other tires in the L317 series lacks a DOT marking and contains the NHS marking. Further, BF markets the Tire for off-road use only, a decision made after consultation with BF"s engineering design groups.

---

**1.** Defendant asserts that the Tire was not taxed for the 1990–1994 period as a result of an agreed audit which was reached because the IRS lacked the resources to pursue enforcement against the Tire, not because the IRS believed the design features of the Tire were such that it was not subject to the tax.

### Standard

Summary judgment may be granted when there is "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In evaluating a motion for summary judgment, courts must view all the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party bears the burden of proving the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is one which, if proven at trial, would lead a reasonable fact finder to find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The non-movant may not rely solely on conclusory allegations in the complaint to defeat a motion for summary judgment, but must come forward with affirmative evidence that establishes its claims and raises an issue of genuine material fact. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. Mere allegations of a factual dispute between the parties are not sufficient to defeat a properly supported summary judgment motion; there must be a genuine issue of material fact. *See Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir.2003). The substantive law involved in the case will underscore which facts are material and only disputes over outcome-determinative facts will bar a grant of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Drawing all justifiable inferences in favor of the nonmoving party, the Court must determine whether a reasonable fact finder would be able to return a verdict for the non-moving party and if so, the Court must deny summary judgment. *Id.* at 249–50, 106 S.Ct. 2505. However, if the non-moving party has not "produced enough evidence for a jury to be able to return a verdict for that party," summary judgment should be granted. *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir.2000).

■■■ The plaintiff bears the burdens of proof and persuasion in a tax refund proceeding, *Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935), and must rebut a presumption of correctness of the Commissioner's determinations, *Sara Lee Corp. v. U.S.*, 29 Fed. Cl. 330, 334 (1993). The plaintiff must prove the exact amount of alleged overpayment. *Sharp v. U.S.*, 1997 WL 364475 (E.D.Tenn. 1997), *citing Sara Lee Corp.*, 29 Fed. Cl. at 334. The plaintiff retains these burdens even where the United States has asserted a counterclaim. *Sinder v. U.S.*, 655 F.2d 729, 731 (6th Cir.1981).

### Discussion

BF makes several arguments in support of its motion. First, it argues that the critical inquiry should be the one it contends the Fifth Circuit adopted in *Great Olympic Tire Co. v. United States*, 597 F.2d 449 (5th Cir.1979), which remains the only case in which a court has interpreted § 4071, the tax statute at issue here. BF asserts that the Fifth Circuit focused on specific design attributes of the tire examined in *Great Olympic*. Second, BF maintains that evidence of the actual use of the Tire demonstrates that it is not of the type used on highways. BF argues that it is

driven only incidentally on the highway, and by vehicles not designed for the highway. Finally, BF argues that there are legal limitations on the Tire's use, as several federal regulations prohibit tires such as the one at issue here from highway use. The Court will address each of these arguments, beginning with the *Great Olympic* case.

*Great Olympic* addressed the taxability of tread rubber wasted in the manufacturing process of retreaded tires. The Fifth Circuit held that tread rubber destroyed during the manufacturing process escaped taxation, while rubber that remained on retreaded tires returned under warranty service did not. The Fifth Circuit concluded that Congress "sought to measure the incidence of the tax as closely as is administratively feasible (and no closer) by actual wear and tear on the highways." *Great Olympic*, 597 F.2d at 451. However, this conclusion is not as categorical as it initially sounds, and is not easily applied to this case. The *Great Olympic* court pointed out that tires destroyed in manufacturing process "never see and never wear on the roads." *Id.* at 452. No monitoring of actual use went into determining whether this wasted rubber actual saw highway use; it was clear that it had not. By contrast, the rubber on the tires returned from "actual service on the roads" was subject to the tax because the tires on which it was placed were "of the type" used on highways, even if they would no longer actually be used on the highways. *Id.* at 453.

The *Great Olympic* court, then, was faced with the binary of rubber that was part of tires that had once seen highway use and rubber that never saw highway use. The *Great Olympic* court made no categorical determination about whether the taxability of a certain tire should be based on actual use or on design features. Its statement that Congress intended to base the tire tax on "actual wear and tear on the highways" is limited to the unique facts before it and does not stand for the proposition that Congress believed that monitoring the *degree* of highway use was feasible. In fact, the *Great Olympic* court noted that it was quite difficult to decide whether a tire was "of the type" used on highways by such monitoring, stating, "Congress recognized that actual use of a tire or retread on the highways was not a practical criterion, since actual use could not feasibly be monitored." *Id.* at 452–53. At the same time, *Great Olympic*'s emphasis on whether a tire was "suitable for highway use" was also based on the unique problems of retreaded tires and did not involve a detailed examination of the design attributes of the retreaded tires at issue in that case, only at whether the tires there could be used on highways. *Great Olympic* is, then, of only limited help in framing this case.

The Court does, however, agree with the *Great Olympic* court that actual use of the Tire alone is not a practical criterion to determine whether the Tire is of the type used in highway vehicles. *See Great Olympic*, 597 F.2d at 451–52. It is more feasible to examine the Tire's design to answer this question, leading to BF"s second major argument in support of nontaxation. BF contends that several design features of the Tire indicate that the Tire was designed for off-road use, and that the Tire will not perform well on the highway, while the United States argues that the Tire is capable of both off-road and on-road applications. The parties have articulated several specific disagreements over the Tire's design features. They agree that the Tire is speed-restricted to 50 mph, but their experts disagree on whether this speed restriction makes the Tire more like an off-road tire, or more like a tire capable of operating both on and off the road. Defendant's expert, Richard Kraft, opined

that the Tire stands apart from off-road tires in its relatively high speed restriction, and in its "typical application," which Kraft stated is "hauling coal from [an] off-road mine site and then over the highway to the unloading site." Kraft Report at 9. BF replies that the Tire's capabilities are irrelevant to the question of taxability, pointing to a case from the Western District of New York, which examined whether a truck was subject to a federal excise tax. *See Gateway Equipment Corp. v. United States*, 247 F.Supp.2d 299 (W.D.N.Y.2003). The *Gateway* court examined a federal regulation classifying certain vehicles as "specially designed for offhighway transportation." *Id.* at 306. The court in *Gateway* rejected as a relevant factor the vehicle's capabilities, focusing instead on the function that the vehicle "predominantly performed." *Id.* at 314–15.

■ In this case, there are genuine issues of fact as to the predominant function performed by the Tire. Another of Defendant's experts, Jerry G. Pigman, testified that he has observed the Tire being used on single-unit trucks in coal hauling operations in eastern Kentucky. Such trucks, in his opinion, are highway vehicles,[2] operating on both public and private roadways. BF argues that the trucks observed by Pigman are overweight and require a permit to travel on the highway and cannot properly be called highway vehicles. IRS agent Kimberly Malone testified in her deposition that the principal function of the Tire is transporting loads in connection with off-highway activities such as mining and timber operations. However, as the Court has noted, there is also evidence in the record that the Tire could travel on the highway for up to an hour at speeds of 50 mph, raising a question about the Tire's predominant function.

Factual issues also exist as to the extent of the Tire's use in areas of ongoing coal hauling operations, such as Eastern Kentucky. A Kentucky Motor Vehicle Enforcement Officer testified in his deposition that he has issued warnings and citations to drivers for highway use of the Tire, but that he has witnessed very few instances of use since handing out the warnings. The IRS conducted a survey over three days in Eastern Kentucky in 1999 and found that coal hauling trucks were on the highway over 70 percent of the time. *See* Kraft Report at 4. Eastern Kentucky was also the subject of investigation by Defendant's expert Pigman. Pigman found that trucks hauling coal in Eastern Kentucky were operating both on- and off-road. Pigman Report at 2. BF argues that Pigman's conclusions should be discounted because he only observed one truck upon which the Tire was mounted. Evidence of actual use can, as the Court has stated, shed light on whether the Tire was actually designed for both on and off-road use. The Court finds that there is a genuine issue of fact as to the Tire's ratio of on-highway use to off-highway use.

The Court also finds there is a genuine issue of fact as to the import of the Tire's 50 mph speed restriction. The parties' experts disagree about whether the 50 mph speed restriction makes the Tire more like other tires that are subject to tax under § 4071 or more like tires that are not taxed, and this is a question of fact; conflicting opinion evidence should not be resolved by the Court at summary judgment. BF's objections to the qualifications of Defendant's experts can be addressed either through a separate motion or through impeachment before the factfinder. Although the Court need not accept "opinion evidence that is connected to existing data only by the *ipse dixit* of the

---

**2.** For the definition of "highway vehicle," see    26 C.F.R. § 48.4061(a)1(d).

expert," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Court has reviewed Mr. Kraft's report and his qualifications and finds that for the purposes of summary judgment, the disagreements he has articulated with the factual conclusions of the plaintiff are sufficient to create a factual issue, precluding summary judgment.

Next, BF points out that it has placed the "NHS," or "not for highway service," marking on the Tire, and that tires so marked take on a legal status that prohibits them from being used for highway travel. BF refers to regulations promulgated by the National Highway Traffic Safety Administration ("NHTSA"), Federal Motor Carrier Safety Administration ("FMCSA"). One such regulation, 49 C.F.R. § 570.62, concerning "Special purpose tires," states, "Tires marked 'Not for Highway Use' or... other such restriction shall not be used on any motor vehicles operating on public highways." Another NHTSA regulation requires tires "designed for highway use" to contain a "DOT" marking. 49 C.F.R. § 571.119. Finally, BF points to the FMCSA's requirement that commercial motor vehicles pass periodic inspections in order to be used on the highway, and that vehicles marked "Not for highway use" would not pass inspection. *See* 49 C.F.R. § 396.17, Appendix G.

It is not necessary at this stage for the Court to evaluate the effect of these regulations on the Tire. The applicability of each of the regulations cited by BF to the Tire is determined by certain facts, each of which is very much at issue in this case. For example, the Court has concluded that a factual issue exists concerning whether the Tire was designed for highway use or was designed predominantly for off-road uses. If the Tire was designed for highway use, then § 571.119, mandating a DOT marking, would apply. The Court has also

found the existence of a genuine issue of fact concerning whether the Tire is routinely or only incidentally operated on the highway. If the Tire does not operate on-road, then § 570.62, prohibiting tires containing the "NHS" mark from operating on public highways, is not applicable to the case. The regulations discussed by the parties are means of enforcement and have force as to categories of tires to which it has not been determined that the Tire in this case belongs, and are relevant only if certain facts relating to design and use are assumed, and those facts are disputed.

Further, there is some uncertainty about the effect of these regulations on the use of the Tire. BF points out that a tire, assuming it is not on the steering axle of the truck (the Tire at issue is not) marked "Not for highway use" will not pass inspection for highway use, according to FCMSA regulations. *See* 49 C.F.R. § 396.17, Appendix G. A driver who is issued a citation for being out of compliance could, however, continue temporarily to operate the truck. In this case, BF added the "NHS" marking in 1995 subsequent to the agreed audit, removing the "DOT" marking. BF points out in its Reply to the United States' Counter–Statement of Material Facts (Doc. No. 40) that it has no financial incentive to add the "NHS" marking, which limits the potential market for the Tire, simply to avoid paying an excise tax, nor is it in BF's interest to create a potential safety hazard by improperly designating a tire. Nevertheless, BF's decision to change the Tire's designation following an IRS audit and in the absence of any significant design changes to the Tire raises a question as to whether a tire manufacturer could avoid taxes simply by changing the sidewall markings. It may be true that BF's decision to remove the "DOT" marking and add the "NHS" marking was an attempt to clarify the Tire's classification both for consumers and the IRS, and that

BF chose to mark the Tire based on applicable regulations governing off-highway tires. Given the circumstances of the change in markings, the "NHS" marking alone does not determine the taxability of the Tire. The marking's significance and the genesis of its change at BF are disputed material facts.[3]

### Conclusion

The Court concludes that myriad factual issues exist regarding the design and use of the Tire at issue. Accordingly, the Court DENIES Plaintiff's motion for summary judgment.

It is so ORDERED.

---

3. The Court recognizes the parties' disagreement about whether the ability of a tire to pass inspection for highway use under the Commercial Vehicle Safety Alliance's safety criteria but not under the FMSCA's regulations. The Court expresses no opinion about this issue. For the purposes of summary judgment, the regulations and criteria are significant only to the extent that the Court finds that a factual issue exists as to whether BF's addition of the "NHS" marking alone could render the Tire non-taxable, regardless of design features and actual use.